We move to the fourth case this morning United States v. Yihao Pao Good morning, your honors. William Flaxbert on behalf of Mr. Pu. With me today is Travis Campbell of our offices. May it please the court. The fundamental injustice of this case, your honors, is that a young man who accepted responsibility for his actions has been sentenced to a significantly increased period of incarceration based on a theory of misconduct that was expressly rejected by the court below. In short, having accepted responsibility for acts of criminal misconduct, Ben Pu has now been sentenced and is presently incarcerated for an amount of time far in excess of the amount of time he should have been sentenced to, particularly in light of the court's downward departure from the sentencing guidelines range that Mr. Pu was found to be in possession of two sets of confidential information, one from Compagnie and one from Citadel. In the case of Compagnie, he had a bunch of source code. In the case of Citadel, he had outputs from source code that was created by Citadel. Critically, in this case, the government has agreed that with respect to both companies there was no actual loss to either company, no actual pecuniary loss to either company for Mr. Pu's mere possession of their trade secrets. The district court, in assessing the facts of this case at sentencing, found the following specifically. There is no evidence before the court to suggest that there was some grander scheme or some grand plan or design to what you were doing. There are suggestions or hints of it, but not enough for the court to say that this was just the beginning of a greater endeavor on your part. And so it appears that it did begin and end with what you did in the case. Therefore, we have a case, put simply, in which there is no actual loss, but in which the government argues for an intended loss amount so large that it adds 20 points under the sentencing guidelines. And a case in which the court itself found that there was no plan to do more than had actually happened in the case. There was no intent to cause any additional loss. Yet in the face of that finding, this court adopted a 12-something million dollar number, which generated a 20-level increase. What does that do to the sentence? The sentence in this case, based on the base level, was 6 points. The sophisticated means enhancement, which we did not contest, is 2 points. Use of the special skill enhancement, which we did not contest, is 2 points. Obstruction of justice, which we did not contest, is 2 points. For his acceptance of responsibility, that's reduced by 2, or 3 if it becomes a much larger number, leaving us with a total of 10. That base offense level leads to a suggested sentence of 6 to 12 months. Mr. Pugh was sentenced to 3 years. Why? Well, because with the 12-point-something million dollar level increase, we add 20 levels to that base offense, resulting in an adjusted offense level of 29, not 30 because we get an extra point for acceptance of responsibility at that level. That leads to a sentencing guideline range of 87 to 108 months. The judge, having assessed that Mr. Pugh had made significant moves in the direction of rehabilitating himself, departed downward from that, under 3553, when he should have been departing downward from the 6 to 12 month range instead. We have to remember that the government's theory all along, and the basis for the loss numbers presented by the government in this case, was that Mr. Pugh intended to obtain for himself things that he did not have, intended to obtain them and use them in a manner which would be in direct competition with his prior employers, and that that would potentially have caused the loss amounts that was argued by the government. But Judge Norgal specifically rejected that. He said there was no plan to do more. That leads to no loss of that amount. Could the government have presented evidence of loss based on what Mr. Pugh did have and what he did do? Potentially they could have. But what they had done is they had agreed that there was no actual loss of what actually happened. We must remember that the government can... Well, if there was no loss, was there a crime? Absolutely, Your Honor. We ended up in a bit of a conflict with the government at the lower court with this respect. The judge asked us directly the question, well, if there's a zero loss here, isn't there no harm? Well, of course there is. These statutes, like other fraud statutes, don't require there to be actual harm. Mere possession of the material is enough. It causes a statutory harm to the party, and that's what was acknowledged by the judge. So we have a statutory harm. In Schneider's case, which is directly on point, this court decided that statutory harm is enough, but the bonus points, as they referred to them, the extra points in the sentencing guidelines, are not awarded unless you establish an actual amount for intended loss, an amount that's actually tied by evidence to intended conduct. And in this case, the number that was presented is never tied back to that intended conduct. So can we still have a crime? Absolutely, Your Honor. But what we don't have, or what we shouldn't have, is 20 points leading to a guideline range of 87 to 108 months instead of a guideline range of 6 to 12. Have I answered Your Honor's question? Well, yeah. Yes, you did. And it's still a little bit odd, but yes, you did. The government certainly had the opportunity to tie an intended loss number to the conduct that actually occurred. They just didn't do it. But the Probation Department did come up with a, what, $10 million? The Probation Department adopted, essentially, the number that was proposed by the government, which came right out of an affidavit, a single-page affidavit from, I'm sorry, this is a multi-page, an affidavit from Citadel for the $10 million figure, which was the value of Citadel's source code. That was not the value of what was taken. That's the value of... Yeah, that was a strange thing. He didn't take the valuable... Well, it's not strange in the context of the case. He wasn't interested in it. It wasn't something that he wanted, so he didn't take it. But what they say is that since this machine, and I don't have half an hour, so I will keep the brief version of alpha code. There's a machine, call it a piece of software at Citadel, that generates predictions of what stocks and bonds and equities are going to do into the next very short period of time. That's not really new. I mean, that's been going on for a while. That's true. That machine, they say, or the software, they say, cost roughly $10 million for them to build. That produces very, very brief outputs, predictions that are valuable for periods of time measured in nanoseconds or microseconds, very small portions of seconds. It is those block, the engine itself that creates the predictions. So after all this is over, what he would get were the predictions. Correct. He had the predictions for a certain period of time, for certain equities. That's why it was... The question is, how much should we invest in amounts where he was inquiring among his confederates about the amount to invest? Well, I don't think he ever spoke to any of his confederates about any amounts to invest or not. He just did some trading on which he lost $40,000. So if we want to look at... It's a hell of a machine. Pardon me? It's a hell of a machine. It works better for the other guys that make better use of it. So they value that machine at $10 million, but not the actual outputs themselves. Those are valueless, as we provided evidence to the court to show that those are valueless beyond a certain small time. Could the government have presented evidences to the value of those predictions? In Mr. Poo's hands, absolutely. They chose not to do so. Now, there's also evidence presented at the Company A where Mr. Poo had significantly more. He actually had pieces of the machine. He had the source code for the machinery. However, he never did anything with it. He merely had custody of it. He did nothing with it, and the court found that he had no plan to do more. Therefore, assigning a value to that that is an intended loss to the company, resulting on competition with the company, simply is at odds with what the lower court specifically found. It leaves us in a situation where, with an acknowledged actual loss of zero as to both companies, we come up with this fantastical number of an intended loss of $12.something million that generates, again, this huge increase. Let me ask you this. If the defendant had stolen the victim's cell phone, would it be fair to market value of the cell phone? Of the cell phone? Absolutely. Is there any real distinction between trade secrets and other property? I think there is a distinction. There's a distinction in a couple of ways. Primarily, if I steal your cell phone, you don't have it anymore, Your Honor. It's gone. It's in my possession. It's a thing that's susceptible of sale for value. If I copy a piece of source code from you, you still have it. You can still make use of it. Fundamentally, Company A and Citadel both still have, and are still using to this day, their source code. The source code that Mr. Pooh never had with respect to Citadel, and the source code he did have with respect to Company A, they still make use of it. They still have the financial benefit of that. He never did anything that caused them any harm, nor did he ever intend to do anything that would cause them any actual future fiscal loss. So how is it different from a cell phone? Well, I don't leave behind a cell phone when I steal your cell phone, but when I copy source code, I leave behind a copy of that. A copy that's just as functional as it ever was. So, and let's go to the other sort of part of your question, which is, what's the value of the cell phone in my hands? If I steal it from you, I can sell it, right? Potentially, Mr. Pooh could sell the source code, and you could have come up with a version of facts that was never adopted by the court. The court said that his conduct began and ended with what he did, and what he did never included any attempts whatsoever to sell the source code. I see that I'm into my rebuttal time, Your Honors, so if I may, I will reserve the rest. You don't have to address it now, but when you come back, we have the conditions of supervised release, or we'll talk about that. Okay, thank you, Your Honor. Good morning, and may it please the Court. Patrick Otluski, Assistant United States Attorney on behalf of the United States in this case. Your Honor, the court below did not commit clear error. The guidelines calculation that it came up with for in this trade secrets case, and what defendant has failed to grasp, both before the district court and before this court, is the type of case we're talking about. This is a trade secrets case. What Ben Pooh, the defendant in this case, stole was secret information. He has tried to use this analogy of an individual who steals a car, and saying that a person who steals a car shouldn't be held accountable for the value of the car factory. How can he use the trade secrets? He used the trade secrets in this case, Your Honor, to make trades for himself. What he did was take the alpha outputs, what he had stolen from Citadel, plug them into his own trading platform, and then make trades on the exact same exchanges. We talked about the output. What is the output? What form, or what's the output? The output is a very long number. It's about approximately 16 digits long. It's in what's known as a CSV file that the defendant had converted that was originally in a proprietary format that Citadel had for its own trading platform that he had then converted. They run it through this, whatever this algorithm is, and then it comes out with this number. Correct. Which is good for minutes, hours. The individual alpha output reflects a very but contrary to defendant's argument, that value, that alpha output still has value into the future. This was presented to the district court and established by the government. If you work it backwards in reverse engineering, is that the way it works? No, Your Honor, in two ways. One, that you can use that alpha output to make predictions in the future, and also that you can use that alpha output to run historical tests. The industry that we're talking about is highly complicated and involves a number of sophisticated trades. Trades that occur nanoseconds, microseconds. What these companies do is they run algorithms over historical data. Understanding how the market responds to certain events in the past is very important in the future, because then you can make a prediction based on past events. That's where Citadel makes its money. How accurate is the prediction? I beg your pardon, Your Honor? How accurate is the prediction under normal circumstances? Your Honor, the prediction for Citadel is very accurate. They're able to make millions of dollars. How accurate? I don't have a precise number, but what I do know is that what we do know from the record is that when a prediction comes out, one of the alpha outputs, that they spend this inordinate amount of time and effort creating, that that prediction allows Citadel to make profitable trades. So it works. And it works in a way... Does it always work? I don't know if it always works, Your Honor. It always works. I mean, somebody would be wealthy beyond the dreams of avarice. And as is the case with Citadel, Your Honor, these individuals who are working in this field were making millions of dollars. The company was making a large amount of money with these outputs that they had invested a significant... How often do they come out with the output? The outputs that are an issue here were at the microsecond level. In other words, if you go today somewhere, how many outputs would they produce today, for example? Eight hours in a day, 60 minutes in an hour, over 4.8 billion outputs per day. So you multiply by microseconds. I mean, through the eight hour day. Yes, Your Honor. Or whatever the trading day. So can you just go over again how it was proper for the District Court to include the amount the victim spent to develop the alpha algorithms and the intended loss amount for alpha algorithms that the defendant did not steal? What the defendant had stolen was part and parcel with the alpha algorithms. These themes themselves, these outputs were trade secrets. The defendant admitted that they were trade secrets in his plea agreement and he acknowledged it at sentencing. Those items had significant value. And so what the District Court had to look at is, how does Citadel create these outputs, these trade secrets? And yes, they are wrapped up with the production costs of the underlying alpha algorithms, the source code that created the outputs. But to say that those alpha outputs don't have value and that those aren't worth millions of dollars is just not true and it's not supported by the record. Because as John Graham, one of the managing directors at Citadel, explained in his affidavit at paragraph 14, these alpha outputs are incredibly valuable. Each one on its own makes millions of dollars in trades. Well, how long a life does it have, though? On a particular prediction, it has a microsecond's worth of value. Was that renewed again, then? What it does, it allows you to input that alpha in the future, in a subsequent trade, and allow you to decide how to make trades in the future, which is what Ben was doing. He was taking alpha outputs from this algorithm that had decided predictions, what's the market going to do in one instance or another, and then trying to trade on them. What the defendant has tried to do is say that those pieces of trading in one specific slice of time. Well, if that's the case, then why would he try and trade on them? Did anybody analyze how much money he made on this brilliant scheme? What the defendant had made by the time the scheme was interrupted, Your Honor, he had actually lost about $40,000. That's great. Outstanding. You already punished him before he got to the end of the line. Well, Your Honor, what he did have was worth significantly more than that. To whom? To Citadel and to Company A. Nobody else lost $40,000. He did. Correct. Well, could he use it again if he hadn't been interrupted at this point? Yes. And that's what's important, Your Honor. When we look at that trading platform that the defendant had created, he was feeding these outputs. He might have lost another $40,000 if he kept at it. He might have lost more money, but, Your Honor, the goal, what the defendant's intent was, what he didn't make these trades with the goal of losing money. It's only by half a percent. Well, I understand he committed a crime. What I'm interested in is how you arrive at the conclusion that his crime was of an impact in the millions and millions. Well, had the defendant been successful with what he was trying to do and had not been interrupted halfway through his scheme by Citadel in August of 2011... In the long run, he might have made money. He was clearly intending to make a lot more money. I know he intended to make money, but he didn't. And he might equally have lost more, right? It's possible, Your Honor. It's completely possible. It's a great crapshoot, only it's electronically operated. It is a crapshoot, but the concern for victims like Citadel and Company A is that the risk that this places their property, because they gain value in the market from their trades, their This is a very sophisticated, a very complicated type of trading that they do. There are not many players in this market, so adding another player to this market, adding another competitor, diminishes their value. And especially when that player in the market is using the same tools, the same tools that Citadel or Company A thought were secret.  How do people find these companies? The two we're talking about here, how does a stockbroker find them? Well, at least with respect to Citadel, Citadel trades a significant portion of its own money, its own proprietary funds, a number, and then other funds come in. The question was, how does anybody else find out about it? Sophisticated traders in the market are aware of these tools. How? It comes to them out of the blue or, I don't know, strolling down the street? As the markets become more and more sophisticated as electronic trading has taken on a greater part of the stock market. They sell this information on the market to Citadel, for instance? Citadel does not. Pardon? Citadel does not sell its information on the market. Company A does sell a part of what the defendant did steal, which was this infrastructure code for its trading platform. It actually licenses it to other trading firms that trade in this environment. But Pew didn't do that here. He just used it personally. He used it personally. And does he still have this? He does not, Your Honor. He does not. It was stricken. He doesn't have it. He doesn't have the law. He doesn't have it. Well, it was seized by the government. It was seized, right. So he no longer has it. So in terms of him, like, selling it to somebody else, that's not a possibility. As far as we know. As far as you know. And then in terms of the intended loss finding, the district court, I think, basically said that there was no challenge to that. But wasn't there actually a challenge to it in the PSR? There was a challenge to it, Your Honor. Okay. And then, but the district court didn't really give us much analysis regarding the intended loss finding, weighing what the defendant said, and balancing the evidence the government put on, which was how much it cost to develop this logarithm. Well, actually, Your Honor, the district court was engaged in this analysis because the district court was presented with two competing theories. The government's theory, which was based on the guidelines, which is look at research and development costs to develop the intended loss figure for a trade seeker, or the defendant's position, which was zero. And then the defendant put on this Brett Holler, who was a risk management consultant, right? That's correct. Brett Holliman submitted an affidavit in advance of sentencing. Right. And so he, but the district court didn't address that, the points that he raised, did it? He did not. It was raised in the government's argument before the district court, which was primarily focused on the defendant's use of these trade secrets for his own benefit. That was something that Mr. Holliman never acknowledged. He made a, he emphasized the fact that the defendant didn't have his own trading platform. He hadn't installed his own servers right next to the exchange where these trades could occur. That was all beside the point. What we knew from the evidence was that the defendant had stolen trade secrets and he was trying to benefit himself. That he might not have been doing it as well yet as Citadel or other players in the market was beside the point. What the district court was presented with was clear evidence of one of the defendant's intent and his attempts to use that information, use what he had stolen for his own benefit. And that's, and if I could, I'd like to try and clarify what the district court said towards the end of its, towards the end of its hearing on intended loss. The district court decided that intended loss under the guidelines was about $12 million. Found that the defendant had the intent under the statute and that these trade secrets cost about $12 million to create. But then later on, the district court made a statement, and it's taken out of context, it sounds strange. It sounds as if the district court was saying that the defendant didn't have any more plans beyond what he had done. Well, if you take that statement in context, what the district court was actually looking at was a statement and an interaction that it had with defense counsel. And this is a sentencing transcript at 37. The 37th page of the transcript, the district court talks, engages Carolyn Gerland, counsel for defendant, on did the defendant trade on his own, trade on the information? And is it their position, was it the defendant's position that that's what his plan began and ended with? And defense counsel conceded yes. Well, later on when the court was imposing its judgment, the court acknowledged that in its opinion, the guidelines overstated the loss. Despite the government's evidence and presentation at sentencing, that the defendant did have larger plans, did have an intent to actually use these trade secrets for his own benefit, not just to trade, but to develop his own enterprise with co-conspirator Sonny Upal. Well, the district court said, I disagree with the government, and it certainly may have been embryonic, but I believe it began and ended with what we have, which is the defendant trading on these stocks and on these foreign exchanges for his own benefit. That was not clear error by the district court. It was well within the range of permissible calculations. It was well supported by the guidelines, and it was consistent with what the probation officer- Well, at the bottom, he got 36 months, right? Correct. Approximately one third of the low end of the applicable guidelines range. And then on this restitution order, so the restitution order was over $700,000, and I don't have any problem with the fact that there were certain recoverable costs that were related to the case. One of the things that the court, I think, relied on was this Fagan letter. And it's not entirely clear to me that all the costs asserted were caused by Pugh's conduct, especially given the fact that Pugh was fired August 30th and the fees extended until his co-defendant was fired three weeks later. And even though the computer forensic analysis work was described, there was no explanation regarding the lawyer's work. That's correct. What the lawyers did. So how does that part of the restitution order stand? Because the defendant did not challenge the restitution order at sentencing. In fact, the defendant stated and conceded at sentencing that we are not challenging those investigative costs that occurred strictly after defendant was confronted by Citadel. That's waiver. That's a clear indication of a defendant telling the district court that it is not challenging the factual underpinnings of its restitution figure. And because the defendant did not challenge that figure, the court did not go into a deeper analysis of how those costs were incurred by the legal team and by that computer forensics firm. Do the sentencing guidelines actually contemplate this kind of factual basis for the offense? They do, Your Honor. With respect to intended loss, application note 3 to guideline 2B1.1 talks about how to calculate loss in a trade secrets case. And it specifically points out to a case involving proprietary information that it's appropriate. Well, trade secrets, yes. But I'm talking about this trading and within using the output and all that business. I don't believe that the guidelines when they were drafted specifically contemplated high frequency trade secrets. I mean, I understand trade secrets. But this is beyond it in a specific way. It is. It is different. But it still falls within that category. The defendant was charged and convicted of a trade secrets theft case conviction. Now, on this waiver argument, the position you're taking, when the sentencing transcript is read as a whole, the defendant didn't really withdraw his objections. Didn't the district court explicitly recognize this on the record at the sentencing hearing transcript at 86, concluding that the evidence was sufficient to support the restitution amount and stating it was over-objection? It was over-objection with respect to a different argument. And that argument was that the defendant had alleged that Citadel shouldn't have received costs, I'm sorry, restitution for fees that were incurred preparing for trial in the matter and following defendant Upal's termination. That was the only argument that defense counsel raised at sentencing. So that was the over-the-objection of the defendant that occurred at sentencing. It had nothing to do with the reasonableness of those internal investigation fees that were incurred between August 26 and September 20. Well, was there a breakout as to fees occurred pre and post? In other words, the line where the co-defendant continued to work, what, three weeks after? And weren't there fees that were attributable to him for that time period? Or was there a breakout? There was not a breakout in terms of per-defendant restitution in that three-plus-week period between August 26 and September 20. But there was a breakout that was consistent with defendant's challenge, which was for fees that were incurred after that. And that amount was about $2.7 million. And Citadel was saying, we're not seeking that $2.7 million for investigative fees that were incurred during the whole course of the investigation, just this limited time window. And just remind me, because maybe I just don't recall this. In the loss that the defendant, you know, this $40,000, the fact that he didn't make any money on this, was this a factor at all in the sentencing order in terms of restitution? It was not. Thank you. Thank you. How much did you have? Time. You have four minutes, counsel. I'll try to be quick. Your Honor's asked a few questions, and one other issue was raised. The government, again, conflates, as it has throughout this case, as it did to the lower court, as it did to the probation officer, the machinery of creation of predictions with the value of predictions. The way that these predictions work is that they are very, very small. The machinery that predicts the value of stocks and how they're going to move makes billions of predictions per day. They are valuable for a very small amount of time. They hold no value in the future. That is the evidence that was presented by our expert that was not. That was a question I asked. How long does it last? They last for, if I could snap my fingers, the amount of time it takes the sound to travel from my fingers to your ears. And you can't take that number and plug it in later? You cannot. They are time coded. They are tied to a specific time. The idea that you could take these micro predictions. And that's evidence in this case? Absolutely, that's in Mr. Holliman's declaration. I invite you to consider it. It's part of the record. It's four pages long. It's pretty clearly laid out. It's very clear that the predictions that he had were of value for the very small amount of time, and then they become valueless. And the government absolutely could have presented a theory of value related to those things, but it did not. The government absolutely could have presented a theory of loss, of intended loss, that was tied to the actual things that he had, but they chose not to. They chose instead to use the parlance of hearts to shoot the moon. They shot for the $12.5 million, because that creates a much larger sentence. It is because this was their theory all along that we specifically reserved the right to contest valuation of the loss in the plea agreement. The plea agreement, which pled guilty as to all of the substantive matters of this case, specifically reserved the right to challenge this because we knew how off base they were. Did you have an argument as to what the value was? It certainly isn't our burden to produce that. Well, I understand that. I just said, did you have an argument? We did. We went back and forth with the judge. There's one piece of source code where we had sufficient data to come up with a valuation, which we thought was approximately $2,000, which sort of lines up with the amount of money that we're talking about. We're talking about a gentleman who lost $40,000 trading. This isn't the guy who made millions of dollars. We go back to these fraud cases, which I know Your Honor is particularly familiar with. You have authored some of the opinions that we cited. Fraud cases are about the intended loss is meant to capture something you were trying to get, but didn't. So you're on a con man who wants to get the $10 million, but you only get the $2,000, and $8,000 goes back to the victims. You get sentenced for the $10,000, or you're the subject of a sting operation, and they sting you for $10,000. You get sentenced for the $10,000. It's not meant to capture a fantastical version of what you were doing presented by the government just as an outlier. Can you speak to this forfeiture issue too? The restitution rather. Absolutely. There was never a waiver of that. We raised specifically the issue at the court that we were unable to look at this declaration. It's a one-page declaration, and the case law on this is dead on point. If you look at Ferdman and then the Seventh Circuit case that we cited in our briefing, it's dead on point that says that it's insufficient to create a record that makes the restitution applicable, unless it's described with enough specificity to show that it's permittable to assess it against the defendant. We raised that issue with the lower court. There was some back and forth colloquy between the government and the judge, and for example, the judge asked if that included the divers. So there was a point at which some hard drives were in a river, and they sent divers down to recover the hard drives. Both the judge and the government agreed that it did, but it's not, it doesn't include it in there. So what's actually included in that number? I don't know. We objected to it. The judge clearly understood that we had objected to it and ordered it anyway. Have I answered Your Honor's question? Yes. Your Honor also asked... I think that was... I apologize. Trying to get a few too many points in my small time left. I think the critical thing here is that the conduct has, the evaluation, and I see that I'm completely out of time. Can I just conclude my thoughts, Your Honor? Finish your thoughts. Okay. The idea of sentencing someone who lost $40,000 to a term in prison that is three times as much as the upper range of what he would have been potentially under the guidelines sentenced, six to 12 months, goes to three years. And I know that Mr. Otluski said that the three years was a third of the amount of time at the lower end of the range, but that's only if you accept this fantastic $12.5 million number. If you don't accept that, then you have a gentleman who's sitting in jail right now for a three-year term when he should have been sentenced on the departure downward from six to 12 months as a first-time nonviolent offender who is in recovery, who is doing none of these things any longer and is doing good in the world. Thank you, Your Honor. Thanks to both counsel. The case is taken under advisement.